IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| CLARK BARTHOLOMEW; TANYA BARTHOLOMEW; and ARIC BARTHOLOMEW, a Minor, By His Next Friend CLARK BARTHOLOMEW;<br><br>　　　　　Plaintiffs,<br><br>　vs.<br><br>BURGER KING CORPORATION; CTI FOODS HOLDING CO., LLC.; UNITED STATES ARMY AND AIR FORCE EXCHANGE SERVICES; DOES 1-150,<br><br>　　　　　Defendants.<br>_____ | CIVIL NO. 11-00613 JMS/RLP<br><br>ORDER DENYING DEFENDANT UNITED STATES ARMY AND AIR FORCE EXCHANGE SERVICES' MOTION TO DISMISS, DOC. NO. 207 |

**<u>ORDER DENYING DEFENDANT UNITED STATES ARMY AND AIR FORCE EXCHANGE SERVICES' MOTION TO DISMISS, DOC. NO. 207</u>**

**I. <u>INTRODUCTION</u>**

This tort action arises from an incident in which Plaintiff Clark Bartholomew ("Bartholomew") allegedly sustained injuries from eating a Triple Whopper sandwich imbedded with two needle-shaped metal objects. The sandwich was purchased from a Burger King Corporation ("Burger King") restaurant franchised to Defendant United States Army and Air Force Exchange

Service ("AAFES" or the "government"). At the time, Bartholomew was an active duty soldier in the United States Army.

On October 12, 2011, Bartholomew, his wife, and his son (collectively, "Plaintiffs") filed this action alleging tortious conduct by Defendants Burger King and CTI Foods Holding Company ("CTI"), the hamburger patty supplier. (AAFES was later added as a Defendant in a First Amended Complaint.) Currently before the court is AAFES' March 10, 2014 Motion to Dismiss, arguing that the court lacks subject matter jurisdiction because Plaintiffs' claims are barred under the "*Feres* doctrine," which insulates the United States from liability for injuries "incident to military service." *Feres v. United States*, 340 U.S. 135, 144 (1950). Based on the following, the Court DENIES the Motion to Dismiss.

## II. BACKGROUND

**A.  Factual Background**

    ***1.  Bartholomew's Military Service and Injury***

Bartholomew was on active duty in the Army from 2007 to 2011. Doc. No. 207-6, Def.'s Ex. A at 12-13,16. In April 2010, Bartholomew was stationed at Schofield Barracks, a U.S. Army military installation, where he and his family lived in on-base military housing. *Id*. His regular working schedule was 6:00 a.m. until "whenever we get done." *Id*. at 34.

According to AAFES, on December 1, 2010, Bartholomew's duty status was "on quarters" because he was experiencing back pain and had not been to work that day.[1]  Doc. No. 207-2, Def.'s Mot. at 3.  AAFES clarified at the hearing on the Motion that this status is similar to taking a "sick day."  That evening, at approximately 6:30 p.m., Bartholomew's wife went to a Burger King restaurant located on Schofield Barracks to pick up dinner.  Doc. No. 207-6, Def.'s Ex. A at 24.  It is undisputed that the Burger King at issue is not limited to use by military personnel but, rather, is open to "non-service affiliated civilians" as well.  Doc. No. 207-2, Def.'s Mot. at 17; Doc. No. 219, Ching Decl. ¶ 7 ("There is no restriction as to who can patronize the Burger King restaurant located on Schofield Barracks.").  Further, at the time of the incident, Schofield Barracks was also not restricted to military personnel -- civilians could enter the installation if they obtained an appropriate pass.  Doc. No. 219, Ching Decl. ¶ 5.  Bartholomew's wife ordered a Triple Whopper meal and took it home for Bartholomew around 6:30

---

[1] AAFES contends that a "quarters" duty status means that "he was released from performing his ordinary duties due to temporary illness or injury, and he was not on pass or leave," Doc. No. 207-2, Def.'s Mot. at 3, although the record contains no official military definition of a "quarters" status.  To the extent this duty status is significant for possible application of *Feres*, the court accepts that Bartholomew was not on leave, and was still subject to military orders.  As discussed below, however, the time of day (approximately 6:30 p.m.) and location of this portion of the incident (at home, eating dinner) suggest that he was not "on duty."  He was not, for example, in uniform, carrying a weapon, and at his post as a military policeman.

p.m. Doc. No. 207-6, Def.'s Ex. A at 24.

While eating the sandwich, Bartholomew bit into a needle-like object, which pierced his tongue. *Id*. at 26-27. After holding a napkin on his tongue to stop the bleeding, he went to an urgent care clinic where he was instructed to place ice on his tongue and monitor it. *Id*. at 27. Two days later, Bartholomew allegedly experienced stomach pain and sought medical attention. Doc. No. 164, Am. Compl. at 7. Apparently, another needle-like object was lodged in his small intestine, requiring hospitalization. *Id*. He was placed on bed rest until December 9, 2010. *Id*. AAFES indicates that Bartholomew received health care from the government for all of his medical injuries related to the Whopper incident and also was given paid time off to recuperate. Doc. No. 207-2, Def.'s Mot. at 3, 17.

### 2. *The AAFES Burger King on Schofield Barracks*

"AAFES is a Joint command of the Army and the Air Force and . . . consists of all activities, personnel, property, and [nonappropriated fund instrumentalities] that provide exchange services to the Army and the Air Force[.]" Doc. No. 207-7, Def.'s Ex. B (Army Reg. 215-8 ¶ 1-9). It is "an instrumentality of the United States . . . entitled to the immunities and privileges enjoyed by the Federal Government." *Id.* ¶ 1-11. Its mission is "to provide quality merchandise and services to its customers at competitively low prices and to generate earnings

which provide a dividend to support morale, welfare, and recreation (MWR) programs," *id*. ¶ 1-6, and it is a "category C" MWR program. Doc. No. 207-8, Def.'s Ex. C (Army Reg. 215-1 ¶ 3-2). The AAFES Burger King is such an MWR program, established under the MWR's food, beverage and entertainment program to assist "in meeting the food service needs of [a military] installation's assigned or visiting peronnel." *Id.* ¶ 8-24a. AAFES operates the Schofield Burger King pursuant to a franchise agreement between Burger King and AAFES. Doc. No. 164, Am. Compl. at 2; Doc. No. 207-2, Def.'s Mot. at 6.

Although AAFES employees are federal civilian employees, Doc. No. 207-7, Def.'s Ex. B (Army Reg. 215-8 ¶ 4-1a), the military has authority over certain of AAFES' operations. *See* Doc. No. 207-4, Wynn Decl. at 3-4. "The Hawaii Exchange, AAFES has a close working relationship with the US Army Garrison Hawaii and the commander of each installation where [AAFES] services are provided." *Id.* ¶ 5. "AAFES takes very seriously the Garrison Command's input [and] [o]n certain issues, such as place and time limitations on the sale of alcohol, the Garrison Commander has decision making authority[.] *Id*. ¶ 6. At the time of Bartholomew's injuries, the Garrison Commander, an active duty military officer, worked closely with AAFES on ensuring its facilities met the needs and requirements of Schofield Barracks. *Id.* ¶ 7. Further, "[b]oth Burger King and the

Department of the Army conduct periodic inspections" of the restaurant in question, and the inspections "include[] examination of food temperature and water quality and ensuring that the food product is within [the Army's] standards." *Id.* ¶ 9.

B.   **Procedural Background**

On October 12, 2011, Plaintiffs filed this action alleging that Burger King and CTI acted negligently in exercising their duty of care owed to Plaintiffs. Doc. No. 1, Compl. On February 19, 2013, Burger King filed a third-party complaint against AAFES, Doc. No. 147, and AAFES filed a crossclaim against CTI and a counterclaim against Burger King on August 9, 2013. Doc. No. 153. On September 17, 2013, Plaintiffs filed an Amended Complaint against Burger King, CTI, and AAFES. Doc. No. 164.

On March 10, 2014, AAFES filed its Motion to Dismiss. Doc. No. 207. On April 10, 2014, Plaintiffs filed their Opposition, Doc. No. 213, and AAFES filed its Reply on April 18, 2014. Doc. No. 216. On March 26, 2014, CTI filed a Statement of No Position, Doc. No. 201, and on April 11, 2014, Burger King filed a Statement of No Opposition. Doc. No. 214. The court heard the Motion on May 6, 2014. AAFES supplemented the record on May 12, 2014 with a declaration setting forth an unopposed and uncontradicted proffer of facts

regarding access to the Burger King on Schofield Barracks. Doc. No. 219.

### III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(1) authorizes a court to dismiss claims over which it lacks proper subject matter jurisdiction. "A motion to dismiss pursuant to the *Feres* doctrine is properly treated as a [Rule]12(b)(1) motion to dismiss for lack of subject matter jurisdiction, rather than as a motion for summary judgment." *Dreier v. United States*, 106 F.3d 844, 847 (9th Cir. 1997).

Under Rule 12(b)(1), a defendant may challenge the plaintiff's jurisdictional allegations in one of two ways, "facial" or "factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). A "facial" attack accepts the truth of the plaintiff's allegations but asserts that they "are insufficient on their face to invoke federal jurisdiction." *Id.* The district court resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient invoke the court's jurisdiction. *Pride v. Correa*, 719 F.3d 1130, 1133 (9th Cir. 2013).

But, "[i]n resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." *Safe Air for Everyone*, 373 F.3d at

7

1039 (citation omitted). "The court need not presume the truthfulness of the plaintiff's allegations." *Id.* "Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *Id.*

"With one caveat, if the existence of jurisdiction turns on disputed factual issues, the district court may resolve those factual disputes itself." *Leite v. Crane Co.*, --- F.3d ----, 2014 WL 1646924, at *2 (9th Cir. Apr. 25, 2014) (citations omitted). "The caveat is that a court must leave the resolution of material factual disputes to the trier of fact when the issue of subject-matter jurisdiction is intertwined with an element of the merits of the plaintiff's claim." *Id.* at *2 n.3 (citing *Safe Air for Everyone*, 373 F.3d at 1039-40). In that situation, the moving party "should prevail [on a motion to dismiss] only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Casumpang v. Int'l Longshoremen's & Warehousemen's Union Local 142*, 269 F.3d 1042, 1060 (9th Cir. 2001) (citation and quotation signals omitted).[2]

---

[2] The court treats the present Motion as a "factual" attack on jurisdiction -- the parties have submitted and rely on evidence beyond the Complaint. Where not contested, the court also relies on allegations of the Amended Complaint to establish certain background facts.

# IV. **DISCUSSION**

## A. The Federal Tort Claims Act and the *Feres* Doctrine

The Federal Tort Claims Act ("FTCA") waives the United States' sovereign immunity for "tort claims, in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. The FTCA, however, does not apply (among other exceptions) to "[a]ny claim arising out of the combatant activities of the military or naval forces, or the Coast Guard, during time of war." 18 U.S.C. § 2680(j). Although this statutory military exception is narrow, *Feres* carved out a broader exception, holding that the government is not liable for injuries that "arise out of or are in the course of activity incident to service." 340 U.S. at 146; *see also Schoenfeld v. Quamme*, 492 F.3d 1016, 1019 (9th Cir. 2007).

*Feres* held that the FTCA did not waive sovereign immunity from actions arising from the tortious conduct of U.S. military personnel causing injuries to other military personnel engaged in non-combat activities. 340 U.S. at 145-46. The Supreme Court emphasized the "distinctively federal [] character" of "[t]he relationship between the Government and members of its armed forces." *Id*. at 143. It also noted the "extremely favorabl[e]" military benefits already awarded to the plaintiffs for the injuries. *Id*. at 145. These policy considerations persuaded

the Supreme Court that Congress could not have intended the FTCA to expose the government to liability to injuries arising "in the course of activity incident to [military] service." *Id*. at 146. *United States v. Shearer*, 473 U.S. 52 (1985), subsequently reasoned that the key inquiry in determining whether an injury was sustained "incident to service" is "whether the suit requires the civilian court to second-guess military decisions, and whether the suit might impair essential military discipline." *Id*. at 57 (internal citations omitted).

*United States v. Johnson*, 481 U.S. 681 (1987), extended the *Feres* doctrine to cases in which federal civilian employees' negligence caused the injuries -- provided that those injuries were suffered "incident to service." *Id*. at 686 ("[T]his Court has never suggested that the military status of the alleged tortfeasor is crucial to the application of the doctrine."). Further, *Johnson* identified three principles underlying the *Feres* doctrine: 1) the "distinctively federal" nature of "the relationship between the Government and members of its armed forces," 2) the "generous statutory disability and death benefits" provided to military personnel and their families, and 3) the potential interference of "the judiciary in sensitive military affairs at the expense of military discipline and effectiveness." *Id*. at 689-90 (citations omitted). This third factor is considered "'the most persuasive justification' for the [*Feres*] doctrine." *Schoenfeld*, 492 F.3d

at 1019 (quoting *Dreier*, 106 F.3d at 849, and stating that Ninth Circuit "cases have focused mainly on whether the serviceman's activities implicate that interest"); *see also Bon v. United States*, 802 F.2d 1092, 1094 (9th Cir. 1986) ("[T]he determination of whether an activity is incident to service must focus on the potential impact of a civil action on military discipline.").

But "[d]espite this framework, [the Ninth Circuit's] *Feres* jurisprudence is something of a muddle," *Schoenfeld*, 492 F.3d at 1019, calling for a "comparison of fact patterns to outcomes in cases that have applied the *Feres* doctrine" as the best method of analysis. *Id.* In this regard, as discussed below, there are several analogous, recreation-based, *Feres* decisions in the Ninth Circuit such that the court is able to conduct a meaningful case-specific analysis here.

The Ninth Circuit applies four non-exclusive factors in assessing whether to apply the *Feres* doctrine:

> 1) the place where the negligent act occurred;
>
> 2) the plaintiff's duty status when the negligent act occurred;
>
> 3) the benefits accruing to the plaintiff because of his status as a service member; and
>
> 4) the nature of the plaintiff's activities at the time of the negligent act.

*Schoenfeld*, 492 F.3d at 1019 (citing *Bon*, 802 F.2d at 1094). None of the factors is

11

dispositive -- "the totality of the circumstances" controls whether *Feres* bars the action. *Id.* The court now turns to these four factors, keeping in mind a comparison of cases with similar fact patterns.

**B.     Applicability of the *Feres* Doctrine to Plaintiffs' Claims**

   *1.     Place Where the Negligent Act Occurred*

   For purposes of this Motion, the court assumes a negligent act occurred at the Schofield Burger King.³ Although not determinative, this fact generally cuts in favor of a *Feres* bar. *Schoenfeld*, 492 F.3d at 1023. But where the nature of a plaintiff's activities are minimally related to military service, this factor is given little weight. *Id.* Here, where Bartholomew was at home, eating a sandwich at 6:30 p.m., any connection between the location of the negligent act and Bartholomew's military service is "tenuous" at best because he was "essentially acting in a civilian capacity." *Id.* at 1020. Overall, the location of the negligent act weighs slightly, if at all, in favor of applying a *Feres* bar.

   *2.     Bartholomew's Duty Status When the Negligent Act Occurred*

   Although "the duty status of the plaintiff when the negligence occurred is often considered, . . . active duty status of a serviceman who is off-duty

---

   ³ For purposes of this Motion, the court assumes that the allegedly negligent act occurred at the Schofield Burger King, and not, for example, the place where the beef patties were manufactured.

at the time of the negligence is only relevant insofar as it may indicate that the serviceman 'was engaging in an activity that is related in some relevant way to his military duties.'" *Dreier*, 106 F.3d at 849 (quoting *Johnson v. United States*, 704 F.2d 1431, 1438 (9th Cir. 1983)). *Schoenfeld*, for example, reasoned that because the plaintiff was on "liberty," his active duty status was "at best marginally relevant to the *Feres* analysis." 492 F.3d at 1023.[4] Because the plaintiff was "off-duty for the day," it eliminated "any relevant links between his activities and his military service." *Id.* (citing *Johnson*, 704 F.2d at 1438).

Here, Bartholomew was on active duty, but his specific status for the day was on "quarters." Although the record does not disclose specific limitations (if any) placed on military personnel on such status, Bartholomew was clearly not engaged in military activity. That he was not working and was eating dinner at home at about 6:30 p.m. weighs against application of the *Feres* doctrine. *See McConnell v. United States*, 478 F.3d 1092, 1096 (9th Cir. 2007) (reasoning that the fact that plaintiff was "not on duty . . . weigh[ed] against the application of the *Feres* doctrine).

---

[4] "'Liberty' is a short period during which servicemen are permitted to leave the base at will. They are not required to seek permission in their comings and goings, or to report on their whereabouts. Liberty status is subject to immediate cancellation. Soldiers on liberty are still subject to the Uniform Code of Military Justice[.]" *Schoenfeld*, 492 F.3d at 1017.

### 3. *Benefits Accruing to Bartholomew Because of His Status As a Service Member*

The third factor -- benefits accruing to the plaintiff because of the plaintiff's status as a service-member -- involves two types of benefits: 1) benefits associated with the activity that led to the injury, and 2) benefits received as a result of the injury. *See Schoenfeld*, 492 F.3d at 1024.

#### a. *Benefits associated with the use of the Schofield Burger King*

Under the circumstances of this case, eating a Burger King sandwich was not a benefit of Bartholomew's military service.[5] Even if AAFES' mission is, in part, to provide convenient food choices for service-members, civilians were equally welcome at the Schofield Burger King. *See, e.g.*, Doc. No. 219, Ching Decl. ¶ 7 ("There is no restriction as to who can patronize the Burger King restaurant located on Schofield Barracks."). In contrast, in *Bon*, the *Feres* doctrine precluded an action against the government where the plaintiff was using a recreational canoe while "taking part in an activity provided [by the Navy] for the benefit of their military service." 802 F.2d at 1095. That is,

> Bon enjoyed the use of the Special Services Center solely

---

[5] AAFES suggests that Bartholomew benefits from the revenues generated by the Burger King because such revenues are reinvested into military MWR programs. Doc. No. 207-2, Def.'s Mot. at 16. Although there may be some indirect benefit to Bartholomew because of this reinvestment program, the benefit at issue is his consumption of the Triple Whopper -- not some tangential and unspecified future benefit.

14

> by virtue of her status as a member of the military. She did not occupy a status similar to that of any civilian with respect to her presence on and use of the Special Services Center's facilities. The record clearly indicates that use of the Special Service Center was restricted to members of the military and employees of the Department of Defense and their guests and dependents.

*Id.* (internal citation omitted).

Similarly, *Millang v. United States*, 817 F.2d 533 (9th Cir. 1987), applied *Feres* in an action brought by a Marine Corps police officer injured while attending a picnic at an on-base park. 817 F.2d at 534. Relying on *Bon*, *Millang* emphasized that "Millang enjoyed the use of the picnic area solely by virtue of his status as a serviceman." *Id.* at 535. "[A]ll the participants (including civilians) were subject to military statutes, regulations and orders." *Id.* Likewise, *McConnell* applied *Feres* to bar an action by the family of an Air Force officer who was injured in a waterskiing accident -- emphasizing that the boat rental was a "benefit" to the plaintiff because it was

> provided through the Luke AFB Recreation Center to "active duty members and their family members" and guests had to be supervised and accompanied by military personnel. . . . Moreover, Lts. McConnell, Donohue, and Frodsham took possession of and transported the boat, indicating that they were exercising their privileges as service members rather than as civilian guests[.]

478 F.3d at 1097.

On the other hand, where activities are open equally to the public and the military, the third prong clearly falls *against* application of a *Feres* bar. For example, in concluding that *Feres* did not bar a claim by an active-duty Marine injured because of a defective guardrail on base, *Schoenfeld* reasoned:

> With respect to the third factor -- benefits accruing to the plaintiff because of his status as a service member -- [the Ninth Circuit] drew a *clear line* between cases where the "plaintiffs had access to the [activity in question] only because of their status as military personnel," and those where civilians might also have access.

492 F.3d. at 1020 (citing *Johnson*, 704 F.2d at 1438-39) (noting that *Feres* applies in cases where "the plaintiffs would not have been privileged to take advantage of the benefits but for their military status")) (emphasis added). *Schoenfeld* distinguished *Bon* by reasoning, in part, that "[in *Bon*] the government offered canoe rentals as a benefit of military service, and that unlike in *Johnson*, only servicemen could take advantage of that benefit." *Id.* at 1022. In *Schoenfeld*, the injured Marine was traveling on an on-base road accessible to members of the general public "between 8 a.m. and sunset every day, but they [had to] first enter their names into the base's Visitor Control Log." *Id.* at 1018.

For the same reason, *Dreier* found the third *Feres* prong inapplicable. In *Dreier*, the decedent soldier was at an on-base beach that was "limited to members of the military community and civilians who acquire use permits." 106

16

F.3d at 846. "In *Dreier*, [the Ninth Circuit] held that because there was evidence that anyone could access the Solo Point area -- even civilians without a permit -- Dreier's presence at Solo Point was not a benefit of his military status." *McConnell*, 478 F.3d at 1097.

Here, any benefit of patronizing the Burger King was not a benefit Bartholomew enjoyed "solely by virtue of [his] status as a member of the military." *Bon*, 802 F.2d at 1095. Rather, Bartholomew "was doing what any member of the public could have done," *Schoenfeld*, 492 F.3d at 1024 -- eating a Triple Whopper from the Schofield Burger King. In sum, this aspect of the third prong weighs strongly *against* applying a *Feres* bar.

        b.      *Benefits awarded as a result of Bartholomew's injury*

The government points out that Bartholomew received paid time off and free medical treatment for all injuries he may have suffered from eating the Triple Whopper, benefits provided solely because Bartholomew was in the military. This fact cuts slightly in favor of applying the *Feres* doctrine. *See id.* ("Schoenfeld has received substantial disability benefits from the military, a fact that weighs in favor of applying *Feres*."). But it is certainly not controlling. *See id.* ("[N]either [*Jackson v. United States*, 110 F.3d 1484 (9th Cir. 1997)], *Dreier*, nor any of our other cases holds that the receipt of disability and medical benefits

17

is a dispositive factor in the *Feres* analysis.").

AAFES also points out that Bartholomew also receives medical retirement from the military for injuries he sustained while deployed in Iraq. Doc. No. 216, Gov't Reply at 6. But those benefits are being paid for an entirely different injury and are irrelevant to his recovery for any injury from eating the Burger King sandwich. *See Schoenfeld*, 192 F.3d at 1024 (defining benefits awarded for purposes of this prong as the "compensation received on account of the resulting injury").

### 4. *Nature of Bartholomew's Activities at the Time of the Negligent Act*

The final and most relevant inquiry is whether Bartholomew's activities at the time of the negligent act "are of the sort that could harm the [military] disciplinary system if litigated in a civil action." *Johnson*, 704 F.2d at 1439. *See, e.g.*, *Costo v. United States*, 248 F.3d 864, 866 (9th Cir. 2001) ("[T]he danger to discipline . . . has been identified as the best explanation for *Feres*."). And, here, this factor clearly weighs against application of *Feres*. The consumption of a fast-food hamburger prepared by civilian employees at a restaurant open to the public hardly amounts to a "sensitive military affair[]" into which the judiciary should avoid interfering. *See Johnson*, 481 U.S. at 690-91. Indeed, Bartholomew's activities leading up to his injury "are not meaningfully

18

distinguishable from those of a civilian." *Schoenfeld*, 492 F.3d at 1025. When Bartholomew ate the Burger King sandwich, he was not "subject to military orders and regulations for the particular activity in which [he] was engaged," *Bon*, 802 F.2d at 1096, nor was he "performing a [] mission." *Johnson*, 481 U.S. at 691. Further, the exercise of jurisdiction over this action would hardly undermine the "'obedience, unity, commitment, and esprit de corps'" necessary within the U.S. military. *See id.* at 690 (quoting *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986)).

In part, *Feres* protects against "not only those suits that directly call into question military decisions, but also 'the *type* of claims that, if generally permitted, would involve the judiciary in sensitive military affairs at the expense of military discipline and effectiveness.'" *Millang*, 817 F.2d at 535 (quoting *Shearer*, 473 U.S. at 59). But even this justification ("sensitive military affairs") for *Feres* does not apply here. Although it is possible that some decisions of the Garrison Commander regarding management of an AAFES Burger King could conceivably become implicated if *Feres* did not bar this type of suit brought by Bartholomew, such "military decisions" could be questioned in a suit brought by a civilian -- a possibility under the FTCA that necessarily exists precisely because the Schofield Burger King was open equally to civilians and military personnel. That is, barring

*this* suit by Bartholomew could not further this *Feres* justification. The same types of "military decisions" could be questioned in a different suit (not "incident to service") by a civilian.

## V. **CONCLUSION**

Three of the four primary factors weigh against application of the *Feres* doctrine -- including the most important factor, the impact on military discipline. Eating a Burger King Triple Whopper (equally available to the military or general public) while at home on a sick day simply does not implicate military command or discipline. Accordingly, the court DENIES Defendant United States Army and Air Force Exchange Services' Motion to Dismiss.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, May 13, 2014.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Bartholomew v. Burger King Corp.*, Civ. No. 11-00613 JMS/RLP, Order Denying Defendant United States Army and Air Force Exchange Services' Motion to Dismiss, Doc. No. 207.